# In the United States Court of Federal Claims

No. 09-283T
(Filed May 31, 2014)
(Reissued December 30, 2014)†

```
* * * * * * * * * * * * * * * * *
                                  *
                                  *
LOUIS J. BALESTRA, JR. and        *    Summary judgment; FICA taxes,
PHYLLIS M. BALESTRA,              *    26 U.S.C. § 3101; nonqualified
                                  *    deferred compensation; special
            Plaintiffs,           *    timing rule, 26 U.S.C. § 3121(v)(2);
                                  *    benefits discharged in bankruptcy;
       v.                         *    26 C.F.R. § 31.3121(v)(2)-1(a), (c);
                                  *    substantial risk of forfeiture; risk of
THE UNITED STATES,                *    default; accrual accounting; plain
                                  *    meaning; rationality of present value
            Defendant.            *    regulations; Chevron; Dominion
                                  *    Resources.
* * * * * * * * * * * * * * * * *
```

    *Mary E. Monahan*, Sutherland Asbill & Brennan LLP, with whom were *Troy L. Olsen* and *Rich Sun*, all of Washington, D.C., for plaintiff.

    *Jason Bergmann*, Tax Division, Department of Justice, with whom were *Kathryn Keneally*, Assistant Attorney General, *David I. Pincus*, Chief, Court of Federal Claims Section, and *G. Robson Stewart*, Assistant Chief, all of Washington, D.C., for defendant.

### MEMORANDUM OPINION AND ORDER

WOLSKI, Judge.

    This is a suit for a refund of $3285.26 of Federal Insurance Contribution Act (FICA) taxes, imposed by 26 U.S.C. § 3101. At bottom, this case concerns a simple

---

† This memorandum opinion and order was originally issued as an unpublished opinion. It is being published in response to defendant's request for publication, with some minor, non-substantive corrections. *See* Order (Dec. 30, 2014), ECF No. 92.

issue: whether the Balestras should have to pay FICA taxes on deferred compensation to which Mr. Balestra had a vested right but, due to the bankruptcy of his employer, he will never receive. Plaintiffs claim that the relevant statutes do not allow the FICA taxation of amounts which are never paid out to an employee. On the facts of this case, the Court disagrees. Therefore, as explained below, Plaintiffs' Cross-Motion for Summary Judgment is **DENIED**, and Defendant's Motion for Summary Judgment is **GRANTED**.[1]

## I. BACKGROUND

The plaintiffs in this case are Louis J. Balestra, Jr., and Phyllis M. Balestra, a husband and wife who filed a joint tax return for tax year 2004. Compl. at 6. Because this suit concerns Mr. Balestra's retirement benefits, the plaintiffs will be referred to singly as plaintiff or Mr. Balestra. Plaintiff was employed as a pilot by United Airlines (United) from January 29, 1979, until his retirement on October 1, 2004. Def.'s Proposed Findings of Uncontroverted Fact (D.P.F.) ¶¶ 1, 20; Pls.' Resp. to Def.'s Proposed Findings of Uncontroverted Facts and Pls.' Additional Proposed Findings of Uncontroverted Fact (Pls.' Resp. to D.P.F.) ¶¶ 1, 20. This case concerns the FICA tax treatment of Mr. Balestra's retirement benefits. Under 26 U.S.C. § 3121(v)(2) (Section 3121(v)(2)), and the regulations under that section, the full present value of Mr. Balestra's future retirement benefits was included in the FICA tax base in the year of his retirement. 26 U.S.C. § 3121(v)(2); 26 C.F.R. § 31.3121(v)(2)-1(a)(2); D.P.F. ¶¶ 24–25; Pls.' Resp. to D.P.F. ¶¶ 24–25.

This tax treatment, where benefits are taxed although deferred, is referred to as the "special timing rule." This is to distinguish it from the "general timing rule" for FICA taxation, which imposes tax in the year in which the wages are actually paid. *See* 26 U.S.C. § 3101(b) (2000);[2] 26 U.S.C. § 3121(v)(2). United had entered bankruptcy proceedings in 2002, two years before plaintiff's retirement. Pls.' Resp. to D.P.F. ¶ 28; Def.'s Resp. to Pls.' Proposed Findings of Uncontroverted Fact ¶ 28 (Def.'s Resp. to P.P.F.). As a result of these proceedings, United's obligation to pay plaintiff's deferred compensation was discharged, with the majority of the benefits never having been paid. Pls.' Resp. to D.P.F. ¶ 79; Def.'s Resp. to P.P.F. ¶ 79. In

---

[1] Defendant also filed a motion to amend its answer to assert an equitable recoupment defense. Def.'s Mot. for Leave to Am. Answer. Because that defense would only have been relevant if the plaintiffs had prevailed, that motion is **DENIED** as moot.

[2] To avoid confusion, this opinion cites and quotes the provision in force at the time Mr. Balestra's benefits were taxed. Due to the subsequent enactment of tax increases, this provision has been modified and the relevant language, although substantively unchanged, is now found at 26 U.S.C. § 3101(b)(1) (2012).

2010, United made the final payments required under its bankruptcy reorganization plan; thus, Mr. Balestra will not receive any additional benefits from this retirement plan. Pls.' Ex. 40 at 3.

Because United withheld FICA tax from Mr. Balestra based on a present value calculation of his retirement benefits at the time of his retirement, Mr. Balestra effectively paid Hospital Insurance (HI) wage tax on wages he will never receive. In total, plaintiff paid HI tax on $289,601.18 worth of nonqualified deferred compensation, of which he would only receive $63,032.09. He paid $4,199.22 of FICA tax on these benefits, which reflects the 1.45% HI tax rate applied to the $289.601.18 present value of the benefits.[3] Pls.' Resp. to D.P.F. ¶ 25; Def.'s Resp. to P.P.F. ¶ 25. Plaintiff's dissatisfaction with this tax treatment produced this suit for a refund of $3285.26.[4]

A bit of background on FICA taxes is necessary to contextualize this dispute. FICA taxes consist of two components, the Social Security tax and the Medicare, or HI, tax. 26 U.S.C. § 3101(a)–(b). Both taxes are collected through a withholding mechanism. 26 U.S.C. § 3102(a).[5] The Social Security component of the tax is limited to wages below a certain amount. The amount below this limit is referred to as the "Social Security Wage Base." *See* 26 U.S.C. § 3121(a)(1). Any compensation in excess of this base generates no Social Security tax liability. By contrast, the HI component is uncapped, and as such it is applied against the entirety of an employee's wages. The interaction of the Social Security Wage Base, the timing of the tax liability, and the unlimited nature of the HI tax, are integral to understanding this dispute. Plaintiff did not pay Social Security tax on his deferred compensation, because his other compensation in the year of his retirement already exceeded the Social Security Wage Base. *See* D.P.F. ¶ 26 (stipulating that Mr. Balestra's other compensation in the year in 2004 was $213,782.53); Office of the Commissioner[:] Cost-of-Living Increase and Other Determinations for 2004, 68 Fed. Reg. 60,437 (October 22, 2003) (establishing $87,900 as the Social Security Wage Base for 2004).

---

[3] For reasons discussed below, plaintiff did not pay Social Security tax on his deferred compensation.

[4] This amount reflects the FICA tax attributable to the portion of the deferred compensation Mr. Balestra did not receive.

[5] The FICA regime also includes another set of essentially identical taxes that are imposed on the employer, also determined as a fraction of the wages of their employees. 26 U.S.C. § 3111(a)–(b). The employer component of FICA is not at issue in this case.

Motions for summary judgment have been filed by both sides under Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), and defendant has moved for leave to amend its answer under RCFC 15(a).  Defendant argues that the special timing rule was properly applied to Mr. Balestra's benefits, and, as neither the statutes nor the regulations provide for a refund for FICA taxes imposed on this sort of wages that are never received, the Court should grant summary judgment in its favor.  Def.'s Mot; Def.'s Reply in Supp. of Mot. Summ. J. & Resp. to Pls.' Cross-Mot. Summ. J. (Def.'s Reply).  Defendant argues that an item need not represent income if it is to be taxed under the special timing rule; that subsequent events do not alter the FICA tax treatment of nonqualified deferred compensation; and that the challenged regulations are, accordingly, valid.  Def.'s Reply at 3–23.

Plaintiff, by contrast, argues that he is entitled to summary judgment because the regulations enacted under Section 3121(v)(2) are arbitrary and irrational in not providing for a "true-up" (i.e., refund) in the event of plan-failure, nor allowing the risk of nonpayment to be included in the calculation of the present value of deferred compensation subject to tax under the special timing rule.  Pls.' Mem. in Supp. of Cross-Mot. Summ. J. & Opp'n to Def.'s Mot. Summ. J. (Pls.' Br.) at 28–39.  For the reasons that follow, the Court finds plaintiff is not entitled to a refund.

## II.  DISCUSSION

### A.  Legal Standards for Motions for Summary Judgment

Summary judgment is appropriate only if, based on materials in the record, a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a), (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562–63 (Fed. Cir. 1987); *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 743 (2005).  Material facts are those "that might affect the outcome of the suit under the governing law."  *Liberty Lobby*, 477 U.S. at 248.  A dispute over facts is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party."  *Id.*

### B.  The Motions for Summary Judgment

This case does not concern any constitutional limits on the taxing power of the Congress.  Rather, the issue is *how* Congress exercised this power.  Plaintiff maintains that when Congress mandated that certain nonqualified deferred compensation "be taken into account" as wages for FICA purposes under the special timing rule of Section 3121(v)(2), it did not intend that amounts that are never received as income should be taxed.  The government argues to the contrary.  As we shall see, defendant has the better of the argument.

Federal Insurance Contribution Act taxes are generally imposed on wages in the year that they are actually or constructively paid by employers to employees. *See* 26 U.S.C. § 3101; 26 C.F.R. § 31.3121(a)-2(a). Wages are defined as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash," with several exceptions that are not relevant for our purposes. 26 U.S.C. § 3121(a). Employees are liable for the FICA tax imposed on their wages. *See id.* § 3101. As explained below, the special timing rule provides that certain wages can be taxed before they are received by employees. The special timing rule does not itself impose any tax; rather, it merely affects the timing of the FICA tax imposed by the relevant operational provision. The operational provision of the employee portion of the Social Security wage tax provides:

> [T]here is hereby imposed on the *income* of every individual a tax equal to the following percentages of the wages (as defined in section 3121(a)) received by him with respect to employment (as defined in section 3121(b))—
>
> . . . .
>
> > (6) with respect to wages received after December 31, 1985, the rate shall be 1.45 percent.

26 U.S.C. § 3101(b)(6) (2000) (emphasis added).[6]

The special timing rule displaces the normal rule, 26 U.S.C. § 3101(b), that wages are taken into account when they are actually or constructively paid. The special rule provides:

> **(2) Treatment of certain nonqualified deferred compensation plans**
>
> **(A) In general**
>
> Any amount deferred under a nonqualified deferred compensation plan shall be taken into account for purposes of this chapter as of the later of ---
>
> > (i) when the services are performed, or

---

[6] The provision which imposes the Social Security tax uses identical operative language, but a different tax rate. *See* 26 U.S.C. § 3101(a).

> (ii) when there is no substantial risk of forfeiture of the rights to such amount.

26 U.S.C. § 3121(v)(2)(A) (2012).  Thus, these provisions on their face appear to permit amounts to be taxed before they are actually or constructively paid.

The regulations implementing Section 3121(v)(2) reflect this approach, as they permit nonqualified deferred compensation benefits to be taxed before they are paid.  *See* 26 C.F.R. § 31.3121(v)(2)-1.  They provide that deferred compensation benefits taxed under the special timing rule are taxed at their "present value," which is computed with reference to actuarial projections concerning life expectancy and a discount rate to account for the time value of money.  26 C.F.R. § 31.3121(v)(2)-1(c)(2)(ii) (2013).  Critical to this case, however, the "present value" of retirement benefits

> cannot be discounted for the probability that payments will not be made (or will be reduced) because of the unfunded status of the plan, the risk associated with any deemed or actual investment of amounts deferred under the plan, the risk that the employer, the trustee, or another party will be unwilling or unable to pay, the possibility of future plan amendments, the possibility of a future change in the law, or similar risks or contingencies.

*Id.*[7]

One of the two statutory factors setting the time for taxation of these benefits, the absence of a "substantial risk of forfeiture," 26 U.S.C. § 3121(v)(2)(A)(ii), is determined under the regulations "in accordance with the principles of Section 83 and the regulations thereunder."  26 C.F.R. § 31.3121(v)(2)-1(e)(3).  The referenced tax code provision, concerning the transfer of property, provides: "The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual."  26 U.S.C. § 83(c)(1).  And the regulations add an additional, non-statutory factor that may delay the imposition of FICA taxes, which is whether the deferred amount is reasonably ascertainable.  26 C.F.R. § 31.3121(v)(2)-1(e)(4).  Under this concept

> an amount deferred is considered reasonably ascertainable on the first date on which the amount, form, and commencement date of the benefit payments attributable to the amount deferred are known, and the only actuarial or other assumptions regarding future events or

---

[7] These regulations apply only to so-called "nonaccount balance plans" which include plaintiff's nonqualified plan.  26 C.F.R. § 31.3121(v)(2)-1(c)(2)(i) (2013).

> circumstances needed to determine the amount deferred are interest and mortality.

26 C.F.R. § 31.3121(v)(2)-1(e)(4)(i)(B) (2013).

In sum, the regulations provide for the taxation of deferred compensation based on a present value calculation that does not discount the promised benefits for the risk of employer default. Nor do the regulations explicitly allow refunds in the event of nonpayment due to plan failure, unlike other circumstances. *Cf.* 26 C.F.R. § 31.3121(v)(2)-1(e)(7), Ex. 12 (showing an employer refund when election to pay taxes before amounts were reasonably ascertainable resulted in an overpayment); *id.* § 31.3121(v)(2)-1(f)(2)(iii) (providing for employer refund when amount deferred is overestimated and taxes are paid earlier than required).

Plaintiff makes two principal arguments in support of his refund claim, both focusing on the description of the relevant FICA taxes as being "imposed on the income of every individual" in Section 3101(b). His first contention is that the FICA tax base is limited to items that would be considered income, of which wages are merely a subset. Thus, even if wages are defined to include deferred compensation, they cannot be taxed before they could be considered income. *See* Pls.' Br. at 12–28. His second contention is that even if Section 3121(v)(2) would allow his deferred benefits to be taxed before they were reduced to income, accrual accounting principles must apply to defer the taxation when the realization of the benefits is doubtful and to provide for an adjustment when amounts included in the FICA tax base are never received. *Id.* at 28–39. Subsumed in this second contention is the argument that the use of a risk-free discount rate to value future benefits promised by an employer in bankruptcy is arbitrary and capricious. *Id.* at 33–35. These contentions are pitched as questions of statutory interpretation, and do not rest on any alleged constitutional infirmities or restrictions.

The starting point for our analysis is the language of the provision that imposes FICA taxes. That provision, Section 3101(b), provides: "In addition to other taxes, there is hereby imposed on the *income* of every individual a tax equal to the following percentages of the wages . . . received by him . . . ." 26 U.S.C. § 3101(b) (2000) (emphasis added). As we have seen, Section 3121(v)(2)(A) states that "[a]ny amount deferred under a nonqualified deferred compensation plan shall be taken into account" when services are performed or there no longer exists a substantial risk of forfeiture of the rights to the deferred amount, whichever occurs later. *Id.* § 3121(v)(2)(A).

Plaintiff asserts that the use of the words "income of every individual" means that FICA taxes are a type of income tax which is computed with reference to "wages received." Pls.' Br. at 14. Plaintiff contends that "wages" are a subset of "income" in the formulation of Section 3101(b), and thus if an item is not "income" it must, by definition, also not be "wages" subject to tax under FICA. *Id.* at 16.

Mister Balestra contends that the use of the words "wages received" was a deliberate choice on the part of Congress to defer taxation until actual receipt. *Id.* at 15.[8] Defendant disputes this contention, arguing that something can be taxed as wages when it is not income and that Section 3121(v)(2) would be meaningless if plaintiff's position were to prevail. Def.'s Reply at 9–14.

The tax code makes plain that, whatever the case might have been in the past, remuneration for employment can be "wages" for FICA purposes although not "income" for income tax purposes. *See, e.g.*, 26 U.S.C. § 3121(a) ("Nothing in the regulations prescribed for purposes of chapter 24 (relating to income tax withholding) which provides an exclusion from 'wages' as used in such chapter shall be construed to require a similar exclusion from 'wages' in the regulations prescribed for purposes of this chapter."). Thus, the use of the phrase "imposed on the income" does not appear to limit wages to items that would also be considered income, but at most places a limit on the extent of taxes collected from an employee --- these cannot be greater than income. Moreover, the tax code is the creation of Congress, which can define its own terms. Congress can define "income" or "wages" however it likes, and can label a tax as falling on "income" even if the tax would not be authorized under the Sixteenth Amendment, provided it is otherwise lawful (for instance, as an excise tax under Article I, Section 8). *See Murphy v. IRS*, 493 F.3d 170, 173 (D.C. Cir. 2007). The Court agrees with the government that Section 3121(v)(2) *must* impose taxes on wages before they are considered income, otherwise it would be emptied of meaning. Readings that render a statute meaningless, in whole or in part, are to be avoided. *See Beck v. Prupis*, 529 U.S. 494, 506 (2000).

The plain meaning of Section 3121(v)(2) is to treat certain benefits as taxable FICA wages before they have become part of an employee's income.[9] Plaintiff's secondary argument is that Congress, by imposing this portion of FICA taxes on a non-cash basis, must have meant to employ an accrual accounting basis. Thus, while the provision would allow benefits to be taxed prior to receipt, to give proper homage to the term "income" it must implicitly require that some sort of deduction or adjustment must be allowed when it can be determined that the benefits will never be received. Plaintiff faults the regulations for lacking such features, and

---

[8] It is evident that by treating certain deferred compensation as wages as of a particular point in time, the effect of Section 3121(v)(2) is to deem these "wages" to be received as of that date. Thus, Mr. Balestra's deferred benefits were "received" within the meaning of Section 3101(b) the day he retired, even though he never actually received a substantial fraction of said "wages."

[9] For what it is worth, the author of the amendment which became Section 3121(v)(2) clearly believed it would subject benefits to tax before they were paid. *See* 129 CONG. REC. 6134 (1983) (statement of Senator Bentsen).

also for not deferring recognition of the wages while their ultimate receipt remains doubtful.  Pls.' Br. at 28–33, 36–39.

While it is true that Congress accelerated the taxation of deferred benefits such as those promised Mr. Balestra, the trigger it selected --- "when there is no substantial risk of forfeiture of the rights to such amount," 26 U.S.C. § 3121(v)(2)(A)(ii) --- employs a term of art from another statute which essentially means the employee has satisfied all of the requirements under his employment contract to earn the right to the deferred compensation.  *See id.* § 83(c)(1).[10]  While this choice may seem odd, as the statute concerned property received and the regulations issued under it expressly exclude "an unfunded and unsecured promise to pay money" from its ambit, 26 C.F.R. § 1.83-3(e), the borrowed concept does not concern any risks of nonpayment.  Congress chose to incorporate this statutory provision, rather than accrual concepts developed under common law.

Moreover, there is no reason to believe that by taxing deferred compensation under a provision that references "income," Congress intended to silently incorporate the features of accrual accounting.  Congress knows how to incorporate these principles when it desires, and it has not done so here.  *See* 26 U.S.C. § 446(c)(2) (indicating that accrual accounting is a permissible accounting system).

In addition, Congress also knows how to provide relief when an early inclusion leads to the taxation of an item which is never paid.  It has provided such relief by offering deductions for previously taxed, but never received, business income.  *See* 26 U.S.C. § 166.  Congress also knows how to expressly disallow such relief.  *See id.* § 83(b) (expressly disallowing a deduction for property transferred in connection with employment which the taxpayer elected to have taxed while still subject to a substantial risk of forfeiture and which was subsequently forfeited).

To be sure, in enacting Section 3121(v)(2), Congress did expressly consider some future consequences that would follow from having already "taken into account" the deferred compensation in question.  But this provision concerns the actual receipt of these benefits by the employee, as they "shall not thereafter be treated as wages for purposes of this chapter."  26 U.S.C. § 3121(v)(2)(B).  On the question of the treatment of benefits that are not ultimately received, the statute is

---

[10]  While legislative history is often of dubious value in construing acts of Congress, it has its greatest claim to legitimacy when it concerns a legislative term of art or when it is found in a conference report --- which is often the document actually adopted by each house to pass the concerned legislation.  Both of these factors are present regarding "substantial risk of forfeiture," which the Conference Report explained to be "within the meaning of sec. 83." H.R. REP. NO. 98-47, at 147 (1983) (Conf. Rep.).

silent. Given the detailed machinery that would need to be employed to accomplish such relief, including such matters as how it is determined that the benefits will not be received and the limitations period that would apply, the Court can hardly fault the Department of the Treasury for not inferring from congressional silence that such a regime was desired. While the creation of such a regime might be allowed, *see id.* §§ 6402, 7805, whether it is *required* is another matter.

The adopted regulations permit the taxation of benefits which are deferred but never paid, a matter on which the statute is at best (from the perspective of the plaintiff) silent. These regulations must be upheld if they are within the zone of reasonableness. *See Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 713 (2011) (concluding that IRS regulations are entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which requires courts to defer to the reasonable interpretation of ambiguous statutes made by the agencies charged with implementing them).[11] As we have seen, the statute requires FICA taxation of deferred compensation before it can be known whether the promised benefits will ever be paid out to an employee. It might have been wiser to have selected as a trigger something other than there being "no substantial risk of forfeiture" --- and instead to have considered the financial solvency of the employer or to have deferred taxation while an employer is in bankruptcy, rather than merely until promised benefits are "reasonably ascertainable."

But these are matters for law makers, not judges --- suboptimal tax laws are still valid tax laws. (Title 26 of the United States Code would be a good deal shorter if the unwise tax laws could be purged by the judiciary.) The Treasury Department recognized the taxing of nonqualified deferred compensation "often requires difficult valuation of future benefits" and "the practical administrative problems that can be encountered by taxpayers in this area," and opted for an approach it believed "to be workable, to minimize complexity, and to provide appropriate flexibility for taxpayers." FICA Taxation of Amounts Under Employee Benefit Plans, 61 Fed. Reg. 2194, 2195 (Jan. 25, 1996). In so doing, it elected not to provide a mechanism for refunding taxes that were based on deferred benefits that were promised, but not received. Under *Chevron*, the Court cannot conclude that this approach was unreasonable.[12]

---

[11] Plaintiff does not dispute that the regulations are entitled to *Chevron* deference. See Pl.'s Mot. at 29 (arguing that the regulations under Section 3121(v)(2) are invalid under *Chevron* "step two" because they are "arbitrary and capricious" and thus not "a reasonable" interpretation of the statute).

[12] The Court notes one advantage of the Section 3121(v)(2) regime, roughly offsetting the detriment of the HI tax falling on amounts never received, is that

Plaintiff's final, and perhaps strongest, argument concerns the regulatory definition of present value.  He argues that it was entirely unreasonable for the Treasury to forbid a bankrupt employer from discounting its unsecured promises for the risk of non-payment when calculating the present value of those promises.  Pls.' Br. at 29.  As noted above, the regulations clearly disallow any such discount.  26 C.F.R. § 31.3121(v)(2)-1(c)(2)(ii).  Plaintiff explains that courts generally treat the concept of present value as including both a credit risk discount and a time value of money adjustment.  Pls.' Br. at 33–36 (citing *Estate of Ridgely v. United States*, 180 Ct. Cl. 1220, 1235–36 (1967), *Navajo Tribe of Indians v. United States*, 176 Ct. Cl. 320, 344 (1966), and *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1333 (Fed. Cir. 2002)).  Mister Balestra contends that this regulation is arbitrary and invalid under *Chevron* step two, relying on the Federal Circuit's decision in *Dominion Resources, Inc. v. United States*, 681 F.3d 1313 (Fed. Cir. 2012).  *See* Pls.' Supp'l Br., ECF No. 79, at 1–3; Pls.' Responsive Supp'l Br., ECF No. 85, at 10–12.

Unlike *Dominion Resources*, in which a Treasury regulation contradicted the rule prescribed by Congress, *see Dominion Res.*, 681 F.3d at 1317–19, the statute interpreted in our case says nothing about how any "amount deferred" is to be calculated.  *See* 26 U.S.C. § 3121(v)(2)(A).  Given that amounts "deferred" are, by definition, to be received in the future, were the Treasury to require these amounts to be calculated based on the nominal value of the future payment stream with no discount whatsoever, this would seemingly contradict the statute's purpose.  But with no guidance from Congress on how to calculate present value, no rule is violated by the Treasury's choice of a present value method.[13]

Plaintiff's argument would have more force if he could identify some off-the-rack rule regarding present value that the Treasury typically employs and from which it deviated, without explanation, in crafting the regulations under Section 3121(v)(2).  But absent any such uniform practice, and considering the clear, contemporaneous explanation of the rationale for this valuation method --- namely minimizing administrative costs and complexities, *see* 61 Fed. Reg. at 2195 --- the Court cannot say the choice of this method was irrational.  The decision of the Treasury Department to avoid the complicated and strategic-behavior-enabling use

---

deferred compensation is deemed received while an employee is still working and may have income exceeding the Social Security Wage base.  Plaintiff, for instance, paid $4,199.22 in FICA taxes on $63,032.09 in deferred compensation actually received.  This corresponds to roughly a 6.7% tax rate, as compared to a combined Social Security and HI rate of 7.65%.  *See* 26 U.S.C. § 3101(a)–(b) (2000).

[13] The Court notes that even a risk-free rate could *underestimate* benefits in an employee's favor when, for example, the inflation premium proves to be excessive.

of risk-adjusted discount rates cannot be said to be unreasonable. Under the deference due the regulations per *Chevron*, as applied to plaintiff they must stand.[14]

Thus, the statute was properly applied to the benefits promised Mr. Balestra under United's nonqualified deferred compensation plan. Sections 3101(b) and 3121(v)(2) required these benefits to be calculated and taxed when he retired, but do not require the use of a risk-adjusted discount rate nor a refund corresponding to the benefits plaintiff never received.

### III.  CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is **GRANTED**, plaintiff's cross-motion for summary judgment is **DENIED**, and defendant's motion to amend its complaint is **DENIED**. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

                                              s/ Victor J. Wolski
                                              **VICTOR J. WOLSKI**
                                              Judge

---

[14] The present value regulation would also be rational under the test from *Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 43 (1983). Not only was the contemporaneous explanation sufficient, but the Treasury had not "entirely failed to consider" the issue of discounting for credit risk, and instead expressly rejected the option. *Id.*